**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 21-144-1 |
| JOHN ADAMS | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant John Adams, self-described "*Captain Save-a-Hoe*," is a manipulative child sex trafficker who coerced vulnerable children into having sex with him, then sold them on the internet to strangers for a profit.  He preyed on vulnerable juvenile girls who were on the street, having run away from a foster care group home, and lured them into his horrific lifestyle by promising them basic human necessities such as lodging, safety, and food.  He then compounded his misbehavior by embarking on a cover-up spree upon learning that the minors had been recovered, lying to multiple law enforcement agencies about his crimes, and tampering with victims and witnesses.  His advisory guideline range is 360 months to life imprisonment, which is the appropriate range for his sentence.  As explained below, a sentence within that range is sufficient but not greater than necessary to reflect the gravity of the defendant's crimes, to ensure that he cannot harm anyone else, and to meet the other 18 U.S.C. § 3553(a) sentencing factors.

I.       **CHARGES AND PROCEDURAL HISTORY**

On April 8, 2021, the defendant was charged by indictment with two counts of sex trafficking of minors, each in violation of 18 U.S.C. § 1591, one count of evidence tampering, in violation of 18 U.S.C. § 1519, and aiding and abetting, in violation of 18 U.S.C. § 2. He was later

1

charged in a six-count superseding indictment as follows: sex trafficking of a minor, in violation of 18 U.S.C. § 1591 (Counts One and Two); tampering with evidence, in violation of 18 U.S.C. § 1519 (Count Three); witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count Four); false statements, in violation of 18 U.S.C. § 1001 (Counts Five and Six); and aiding and abetting, in violation of 18 U.S.C. § 2.

The defendant filed a litany of pretrial motions, to include motions to suppress evidence and statements, motions to dismiss, and numerous motions for bail. Each of his many motions was fully litigated, and the Court properly denied each one.

On November 22, 2022, the defendant pleaded guilty to the superseding indictment pursuant to a written plea agreement. Sentencing is scheduled for June 6, 2023.

## II.   FACTUAL BACKGROUND

### A.   Offense Conduct

In early January of 2020, two minors, J.A. and S.H., ages 15 and 16 respectively, ran away from their foster care group home and learned from a friend that defendant John Adams could give them a place to stay. Adams met the juveniles for the first time when he picked them up in West Philadelphia late at night on or about January 10, 2020. He brought the minors home to his residence at 1642 West Mentor Street in Philadelphia, where they spent the night. Adams learned almost immediately from the juveniles that J.A. was 15 years old and S.H. was 16 years old (Adams was 40 years old at the time). In exchange for allowing the minors to stay at his house, Adams required each of the minors to have oral and vaginal sex with him on multiple occasions, and told each of them that he would kick them out if they refused to engage in sexual activity with him. Adams also directed the minors to engage in commercial sex for which he took a portion of their profits. Adams feared that his neighbors on West Mentor Street would discover his sexual

2

exploitation of J.A. and S.H., so he harbored the juveniles at a property he managed at the time, located at 2271 North Cleveland Street in Philadelphia. The North Cleveland Street property was a vacant house, occupied by multiple women for the sole purpose of commercial sex.

Adams' co-defendants, Malachai Kendall (a/k/a "Kah," a/k/a "Kai") and Mercedes Hampton-Devero (a/k/a "Jas," a/k/a "Jazz"), joined Adams' efforts to exploit J.A. and S.H. for commercial sex. All three defendants either used their cell phones to directly post advertisements for the minors on a website which advertises sexual services for a fee known as "megapersonals.eu" (hereinafter "Megapersonals"), or directed a co-defendant to do so. Adams and his co-defendants collected either all or a portion of the profits paid to the minors by sex buyers for commercial sex acts. If Adams did not collect the money directly from the minors, Kendall and/or Hampton-Devero would collect it and give it to Adams when he visited the North Cleveland Street property. Upon communication with sex buyers to determine when a sex buyer was near and the type of sexual activity the sex buyer wanted, Adams and his co-defendants directed the minors via cell phone or in person to engage in commercial sex acts.

On multiple occasions, Adams directed the minors not to tell anyone what they were doing. Adams also directed the minors to conceal their real ages, telling them that they could get everyone in trouble. Adams further directed the minors to delete their text message conversations with him, which revealed his child sex trafficking activities.

For a few days near the end of January of 2020, J.A. and S.H. stayed with Hampton-Devero at the Microtel hotel in Philadelphia. By on or about January 29, 2020, Adams had picked up the minors from the hotel, and they returned to Adams' residence on West Mentor Street where he resumed his sexual exploitation of each of the juveniles. S.H. and J.A. left Adams' residence together on January 30, 2020, and were recovered by law enforcement on January 31, 2020.

J.A. and S.H. were taken to the police station, where S.H. was interviewed by detectives from the Philadelphia Police Department's Special Victims Unit, and J.A. was interviewed by special agents from the Federal Bureau of investigation ("FBI"). J.A. and S.H. each divulged that they had been living with Adams between his West Mentor and North Cleveland Street properties for approximately three weeks prior, and that he had been having sex with them and directing them to engage in commercial sex.

While at the police station, S.H. hid her phone—an Apple iPhone SE—from law enforcement, and it was not seized until weeks later. By the time law enforcement seized her phone, she had deleted all of its contents related to the conduct and time period charged in the indictment because Adams instructed her to do so. J.A.'s phone, an Apple iPhone 6, was seized immediately, and revealed numerous text messages between her and Adams which corroborated the charged conduct.

Each of the minors contacted Adams upon being recovered by law enforcement, while they were still at the police station. Just hours later, Adams went to the Tinicum Township Police station shortly after midnight on February 1, 2020, totally unsolicited, stating that he wanted to "clear his name." Adams wrote a false exculpatory statement, but admitted that he met J.A. and S.H. about two weeks prior, and that he picked them up because he learned that they were on the street. He further admitted that they stayed overnight at his house. On the statement form, Adams provided a phone number ending in 7779 as his phone number—the same number J.A. used to communicate with him.

The defendant's actions were in or affected interstate or foreign commerce. Among other things, Megapersonals is based in the European Union, and it does not maintain offices in the United States. Adams accessed this internet website, and directed his co-defendants to do the same,

for the purpose of providing the victims to the public. In addition, the text messages obtained from J.A.'s cell phone between her and Adams make it clear Adams used his cell phone, a Samsung Galaxy S10, to direct the minors' commercial sex activity. Adams' Samsung Galaxy S10 and the Apple iPhones belonging to S.H. and J.A. were each manufactured outside of the United States.

A few days after the minors were recovered, on or about February 3, 2020, Adams solicited J.B. a/k/a "Chyna," at the time a 17-year-old girl, to help him cover up his sex trafficking activities. Adams brought J.B. with him to meet with S.H. and S.H.'s brother, inside of a car. Before arriving, Adams contacted Kendall and Hampton-Devero, to advise each of them separately that he was going to record a conversation between himself, J.B., S.H., and S.H.'s brother, which he would later use to exculpate himself in the FBI's investigation. He further advised Hampton-Devero that he would use the recording as blackmail, should S.H. cooperate with law enforcement in this investigation.

Unbeknownst to S.H. and her brother, Adams recorded a false exculpatory statement to S.H. and her brother, with J.B.'s assistance, who chimed in to say, "I used to do tricking and shit when I was younger. But John, he helped me." The government identified J.B., who divulged in an interview that Adams paid her $100 to make that statement.

During this recording, Adams also paid S.H. a sum of cash to dissuade her from cooperating with law enforcement ("I know you need this, I'm a give this shit to you though"). During the meeting, Adams also paid S.H.'s brother a sum of cash, in an attempt to convince him to dissuade S.H. from cooperating with law enforcement. Also during the recording, Adams asked S.H.'s brother to send him text messages so that Adams could give the messages to the FBI to exculpate himself ("What I wanna do is when they come pick me up, I don't wanna – I just wanna hand them motherfuckers an envelope…"). When the meeting ended, Adams sent the recording to Kendall

5

and Hampton-Devero via email, and advised each of them that he had successfully made the recording. For weeks after the meeting, Adams continued to provide S.H. sums of cash in varying amounts so that she would not cooperate with law enforcement, and also gave S.H.'s brother additional sums of cash in varying amounts so that he would convince his sister not to talk to law enforcement.

A few days after making and transmitting the recording, on February 6, 2020, Adams walked into the FBI, again totally unsolicited, stating that he wanted to clear his name and gave another false exculpatory statement to FBI agents that was recorded. He provided the same phone number that he wrote on his Tinicum statement form, the number ending in 7779 that J.A. used to communicate with him. During this interview, Adams stated that his best friend refers to him as *"Captain Save-a-Hoe."*

Adams began the interview by telling agents "I know I'm under investigation." Among his relevant admissions, Adams told agents that he knew the minors were each 15 and 16 years old, and as to J.A., stated, "I call her the little one." He advised that both minors stayed at each of his properties, and he stated that he kicked them out 3 to 4 days before they were located by law enforcement. He stated that multiple girls stayed at the North Cleveland Street house, and that he had just met them (but he could not recall how). He referred to it as "a party house," but he could not "say yes or no whether men were coming over," nor could he say "yes or no whether people were having sex at Cleveland." Adams stated that he required the young women who stayed there to pay him $100 per week. He stated, "my lifestyle is… I'm single... I will meet a girl, and if she got a problem, she'll come to my house…until she do something wrong to me… she can stay...."

Adams also revealed that on one occasion, he drove J.A. to Planned Parenthood because she had an infection, and then to Einstein Hospital when she could not be seen at Planned

Parenthood. He discussed "Chyna" (J.B.), stating that she was a stripper who "used to bring all the hot girls over." He claimed that he helped "Chyna" get a job and again reminded the agents, "I'm *Captain Save-a-Hoe*." Adams told agents that while J.A. and S.H. stayed at his house on West Mentor Street, he made sure they ate. He stated that he bought tampons for J.A. and S.H., and one of them was menstruating while staying with him at his house. While denying that he ever took money from J.A. and S.H., he suggested, "I'm providing for them."

Adams had his Samsung cell phone with him, which agents searched on the spot pursuant to his consent. They immediately noticed that almost everything preceding the minors' recovery (and immediately after) had been deleted. By this point, agents had seen the inculpatory text messages from Adams on J.A.'s cell phone. Agents asked Adams why he deleted everything, and he stated that he deleted things because he thought his phone was being tapped, and he did a "hard reset."

Adams flatly denied ever "having a sexual conversation" with J.A. and S.H., and denied that he had a Megapersonals account. He claimed that he just found out about Megapersonals, and did not know what "posting" meant. Yet, a search of the defendant's Google account voteadamsfortraffic@gmail.com revealed that, on multiple occasions, he searched for "Megapersonals," and visited the website. The defendant further admitted to sending emails to Megapersonals regarding his ability to post advertisements, all of which were located in his Gmail account. Records provided by Megapersonals reveal that Adams, in fact, had an account at the time, which was linked to his email account, voteadamsfortraffic@gmail.com, and that he used it to post online advertisements on at least two occasions during the period charged in the indictment. Records from Verizon confirm that on at least one of these occasions, the IP address associated with the post is assigned to Adams' residence, 1642 West Mentor Street.

Text messages found in J.A.'s cell phone disprove Adams' false statement that he "never had a sexual conversation" with J.A. In just a small portion of their messages, Adams told J.A. that the minors would be prostituting and staying with the defendant; Adams directed J.A. to engage in a commercial sex act contemporaneously as it was occurring; Adams asked J.A. for oral sex; and, he acknowledged that the minors were juveniles and, as such, his conduct was criminal.

A search warrant executed at 2271 North Cleveland Street revealed a filthy vacant residence, with condom wrappers scattered throughout. Call detail records associated with Adams' cell phone, his co-defendants' cell phones, and the minors' cell phones all revealed that Adams communicated with his co-defendants and victims on hundreds of occasions during the period charged in the indictment, and in the days following the recovery of the juveniles. J.A. and S.H. have each identified themselves and each other in copies of Megapersonals advertisements that were posted during the time period charged in the indictment.

## B.      Other victims known to the government

The investigation of the defendant further revealed additional juveniles that he sexually abused. The government previously brought to the Court's attention the defendant's sexual exploitation of J.B. a/k/a "Chyna," who Adams had referred to as "a stripper" who "used to bring all the hot girls over" when he requested to speak to FBI agents on February 6, 2020 (ECF #126). In reality, as revealed through an interview with the government, J.B. met Adams when she was only 14 years old and enrolled at Grover Washington Middle School in Philadelphia. At the time, she was staying with her grandmother, but met Adams on a dating app (called "Tagged") and ran away from home. J.B. divulged that, beginning when she was 14 years old, she had oral and vaginal sex with Adams on several occasions because he required her to do so in order to stay at his residence. She further disclosed that she had sex with Adams' friends in exchange for money at

8

Adams' direction. J.B. stayed at Adams' West Mentor Street house "on and off" between 2017-2020. Adams told J.B. that once she turned 17 years old, he would lose interest in her sexually.

The government also identified I.G., who was 15 years old when she met Adams through another minor girl. While the FBI was investigating Adams for the charges in this case, in August of 2020, Adams picked up I.G. and her minor friends in their home state of Delaware and drove them to his residence on West Mentor Street, where he provided them alcohol and marijuana. Before I.G. left Adams' residence, she used the bathroom located on the second floor. As she was exiting the bathroom, Adams told her to come into his room, which was dark. Adams told her to "show me your little moves" and Adams unbuttoned her pants and pulled them down. I.G. pulled her pants up and was able to leave when Adams drove I.G. and her friends back to Delaware.

A day or two later, while I.G. was staying with her grandmother in Philadelphia, I.G. received direct messages to her Instagram account from Adams through his Instagram account "jstrong121279." Adams directed I.G. to come back to his residence and paid for an Uber to pick up I.G. from her grandmother's house and bring her to Adams' residence on West Mentor Street. When I.G. arrived, her minor friends were already at Adams' residence. Adams provided alcohol and marijuana to I.G. and her friends.

I.G. went upstairs to use the bathroom and Adams pulled her into his room. Adams was naked and pushed I.G. to lay down on the bed, telling her that she was "supposed to be getting paid for this." Adams undressed I.G. and forced her to perform oral sex on him by holding her head down on his penis. When he stopped, I.G. attempted to get dressed, but Adams stated, "what you doing, you not done yet." Adams forced her to bend over the bed, hit her back with his hand, then vaginally raped her. I.G. disclosed the incident to her mother, who immediately called the police. The government anticipates that I.G. will be present at sentencing with her mother, and

each may want to address the Court.

## III.    SENTENCING CALCULATION

### A.    Statutory Minimum and Maximum Penalties

The Court may impose the following statutory maximum and mandatory minimum sentence: Counts One and Two (sex trafficking of a minor), life imprisonment, a 10-year mandatory minimum term of imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution pursuant to 18 U.S.C. § 1593, and, if the defendant is found not to be indigent, an additional $5,000 special assessment shall be imposed pursuant to 18 U.S.C. § 3014 on each count; Count Three (tampering with evidence), 20 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment; Count Four (tampering with a witness), 20 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment; Counts Five and Six (false statements), 8 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum and Mandatory Minimum Sentence is: Life imprisonment, 10 years' mandatory minimum imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $1,500,000 fine, and a $10,400 special assessment. Full restitution shall be ordered. Forfeiture of all proceeds traceable to and all property involved in the violations of 18 U.S.C. § 1591 also may be ordered.

### B.    Guidelines Calculation

The government agrees with the Probation Officer's calculation of the defendant's advisory Sentencing Guideline range as 360 months to life imprisonment, based on a final offense level of 42, and the defendant's criminal history category of I. Draft PSR ¶¶ 70, 120.  As of the date of this

filing, the defendant has not objected to the calculation.

Group 1 (Sex Trafficking of Victim J.A.)

| | |
|---|---|
| Base offense level – convicted under § 1591(a)(1) (§ 2G1.3) | 30 |
| Defendant unduly influenced J.A. (§ 2G1.3(b)(2)(B)) | +2 |
| Use of a computer (§ 2G1.3(b)(3)(B)) | +2 |
| Offense involved a commercial sex act (§ 2G1.3(b)(4)(A)) | +2 |
| Obstruction of Justice (§ 3C1.1) | +2 |
| | 38 |

Group 2 (Sex Trafficking of Victim S.H.)

| | |
|---|---|
| Base offense level – convicted under § 1591(a)(1) (§ 2G1.3) | 30 |
| Defendant unduly influenced J.A. (§2G1.3(b)(2)(B)) | +2 |
| Use of a computer (§2G1.3(b)(3)(B)) | +2 |
| Offense involved a commercial sex act (§2G1.3(b)(4)(A)) | +2 |
| Obstruction of Justice (§ 3C1.1) | +2 |
| | 38 |

Multiple Count Adjustment

| | Adjusted Offense Level | Units Assigned |
|---|---|---|
| Group 1 | 38 | 1 |
| Group 2 | 38 | 1 |
| Total number of Units assigned: | | 2 |

The adjusted offense levels for each of the two groups is 38. Draft PSR ¶ 54. Two points are added pursuant to the number of assigned units (§ 3D1.4), totaling 40. Draft PSR ¶ 65. Per § 4B1.5(b)(1), 5 levels are added for a pattern of exploitation against a minor, for a total offense level of 45. Draft PSR ¶ 67. The defendant is entitled to a 3-level downward adjustment for accepting responsibility (§ 3E1.1(a) and (b)), resulting in a total offense level of 42. Draft PSR ¶ 42. An offense level of 42 and criminal history category I yields a guideline range of 360 months to life imprisonment.  Draft PSR ¶ 120.

### III.   ANALYSIS OF STATUTORY FACTORS

A thorough consideration of the guideline sentence range and all of the § 3553(a) sentencing factors shows that this Court should impose a sentence between 360 months to life imprisonment.

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[1]

---

[1]  Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States*
*continued . . .*

1.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The defendant's actions in this case were horrific. He targeted the most vulnerable members of the community—minors on the street from broken families who desperately needed lodging and food, the most basic human necessities. Once he brought the minors home with him, the defendant repeatedly sexually abused each of the girls by requiring them to have sex with him in order to have a "safe" place to stay. Then, as if the girls were his property rather than human beings and children, the defendant sold the juveniles for sex on the internet to strangers, profiting from his sexual exploitation of them. Knowing full well that his conduct was criminal and could land him in prison, he repeatedly told the juveniles to delete evidence of his crimes from their cell phones and directed them to lie and conceal his sexual exploitation of them. Not once regretting his actions, the defendant stopped at nothing to cover his tracks, paying off and threatening his victims, and providing false exculpatory statements to anyone who would listen, including the FBI. While at the FBI office, he referred to the moment the minors were rescued as "funny" when they contacted him from the police station, and he laughed his way through his conversation with agents. He portrayed his actions as benevolent, repeatedly referring to himself as "*Captain-Save-a-Hoe*," as if it were a badge of honor.

There is absolutely nothing funny or charitable about Adams' actions. He is a child predator and a manipulative pimp who introduced children to prostitution and repeatedly sexually abused them. But he did not stop there. He maintained an entirely separate property so that he could harbor numerous women to exploit for commercial sex, profiting from each one of them. Then, when it

---

*v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

became too much for him to manage on his own, he recruited a teenage boy from his son's high school (co-defendant Kendall) to collect proceeds from the women he harbored at his North Cleveland Street property, and help direct their commercial sex activities.

Even after the minors were recovered, and after Adams told the FBI that he knew he was a suspect in this case, he continued to harbor S.H. at his residence in exchange for sex, all while she was newly pregnant. He threatened her by telling her that if she cooperated with the government in this case, her baby would be taken away from her.

To this day, despite pleading guilty, the defendant maintains that his actions are not worthy of prosecution in this courthouse. In his most recent letter to the Court (ECF # 161), he insists, "I shouldn't even be in your court room." Instead of displaying any remorse whatsoever, the defendant has exhibited entirely self-centered behavior during and after the charged actions in this case. He even went so far as to rape I.G., 15 years old at the time, 6 months after he unsuccessfully tried to eliminate himself as a suspect in this case when he lied to the FBI. As previously mentioned, he also continued to harbor S.H. at his residence while requiring her to have sex with him, when she had nowhere else to go. The defendant's deplorable actions are not only worthy of prosecution in this courthouse, but they have earned him a sentence within his guideline range of 360 months to life imprisonment.

The defendant had a good upbringing, attended good schools, and was a good athlete. He admits than he ran away from his boarding school, and his mother confirmed he "[acted out]," the impetus for which is not entirely clear in the PSR. Draft PSR ¶¶ 86, 93. Indeed, his father and brother were each in the military, and his mother is similarly a productive member of society. He is a high school graduate, has a wide-ranging employment history, has no medical restrictions, and does not suffer from mental illness or substance abuse. In short, there is nothing about the

14

defendant's history or characteristics that helps explain his criminal conduct or mitigate the severity of his crimes.   A guideline sentence will thus reflect the gravity of the offense, as well as the lack of any mitigating circumstances.

      **2.**        **The Seriousness of the Offense, Respect for the Law, and Just Punishment**

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  § 3553(a)(2)(A). Child sex trafficking is incredibly serious, appalling, and devastating. The defendant laughed his way through the FBI's interview, tampered with witnesses, and lied to every law enforcement agency that assisted in this case. The defendant still maintains that his egregious conduct does not violate federal law. A guideline sentence of 360 months to life imprisonment will reflect the severity of the offense, provide just punishment for it, and promote respect for the law, for which Adams has demonstrated he has no regard.

      **3.**        **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant**

A guideline sentence of 360 months to life imprisonment affords adequate deterrence to others who would commit a similar offense and will protect the public from further crimes of the defendant for a lengthy period of time. § 3553(a)(2). The defendant was completely undeterred by the FBI's investigation after he acknowledged to them that he knew he was a suspect in this case, and he continued to coerce minors into having sex with him (to include one of his victims in this case). More than anything, the defendant must be deterred from sexually abusing and exploiting vulnerable juveniles for his own sexual and financial gratification.

4.     **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no demonstrated need to adjust the sentence in order to provide the defendant with needed educational or vocational training, medical care or additional treatment that cannot be adequately addressed by the Bureau of Prisons.

5.     **The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

A guideline sentence of 360 months to life imprisonment avoids unwarranted disparities and is sufficient but not greater than necessary to accord with the purposes of sentencing under 18 U.S.C. § 3553. Indeed, our elected leaders' concern specifically with below-Guidelines sentences for sex traffickers is evident in 18 U.S.C. § 3553(b)(2), which expresses Congress's view that such offenders should receive a guideline sentence.

Notably, courts in this district and elsewhere have imposed substantial prison sentences for child sex trafficking. *See, e.g.*, *United States v. Horne*, No. 2:18-cr-392 (Pappert, J.) (540 month sentence imposed for three counts of sex trafficking minors), *aff'd*, No. 20-2716 (3d Cir. 2021), *United States v. Kent*, No. 2:18-cr-417 (Rufe, J.) (360 month sentence imposed for one count of sex trafficking of a minor via force, threats, and coercion) (appeal filed); *United States v. Womack*, 646 F. App'x 258, 259, 261-62 (3d Cir. 2016) (affirming life sentence imposed by Judge Goldberg for sex trafficking of two adults and one seventeen-year-old); *United States v. Bridges*, 2022 WL 4244276 (3d. Cir. 2022) (affirming 420 month sentence imposed by Judge Quinones for multiple counts of sex trafficking minors and adults); *United States v. Mack*, 808 F.3d 1074, 1079, 1081, 1085 (6th Cir. 2015) (affirming life sentence on each of four counts of sex trafficking, one involving a minor); *United States v. Jenkins*, 821 F. App'x 504, 508-509 (6th Cir.) (affirming life

sentence for sex trafficking and sexual exploitation of a minor); *United States v. Alaboudi*, 786 F.3d 1136, 1138-39 (8th Cir. 2015) (affirming life sentence on each of four counts for sex trafficking two minors and two adults); *United States v. Rodriguez*, 589 F. App'x 513, 513-14 (11th Cir. 2015) (affirming life sentence for sex trafficking minors and adult); *United States v. McKinney*, 577 F. App'x 631, 631-32 (8th Cir. 2014) (affirming life sentence on one count of sex trafficking a minor where defendant pleaded guilty).

Of course, the question for this Court is not what sentence was appropriate in other cases, but what sentence is appropriate for this defendant. The cited cases clearly reinforce that a sentence between 360 months to life imprisonment for Adams is not unreasonable and is, in fact, the appropriate range for him.

6.      **Restitution**

Restitution to victims of sex trafficking is mandatory under 18 U.S.C. § 1593, which requires compensation in "the full amount of the victim's losses." 18 U.S.C. § 1593(b)(1). This covers costs incurred for "medical services related to physical, psychiatric, or psychological care," "necessary transportation, temporary housing, and child care expenses," "lost income," and "any other relevant losses incurred by the victim." *See* 18 U.S.C. §§ 2259(c)(2), 1593(b)(3). It also includes "the greater of *the gross income or value to the defendant of the victim's services* or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3) (emphasis added). This is so, "notwithstanding that [the victims'] earnings came from illegal conduct," *i.e.*, "commercial sex acts within the meaning of 18 U.S.C. § 1591." *United States v. Mammedov*, 304 F. App'x 922, 927 (2d Cir. 2008); *accord, e.g.*, *United States v. Cortes-Castro*, 511 F. App'x 942, 947 (11th Cir. 2013); *United States v. Jackson*, No. 2:16-cr-54, 2018 WL 3127241, at *2 (D.S.C. June 26, 2018).

17

That is, "the statutory language is clear that mandatory restitution includes not only the victims' actual losses, but also the defendant's ill-gotten gains." *United States v. Webster*, Nos. 08-30311 & 09-30182, 2011 WL 8478276, at *3 (9th Cir. 2011).

In ordering restitution, the court "need only 'estimate, based on facts in the record,' the victims' losses 'with some reasonable certainty'" — *e.g.*, by estimating the number of commercial sexual encounters engaged in by each victim on a daily or other temporal basis and multiplying it by the estimated amount charged per date. *Id.* (citation omitted). "The amount of restitution need not 'be proven with exactitude.'" *United States v. Williams*, 783 F. App'x 269, 277 (4th Cir. 2019) (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)).

"If . . . more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h); *see also* 18 U.S.C. § 1593(b)(2); *United States v. Williams*, 319 F. Supp. 3d 812, 817-18 (E.D. Va. 2018) (imposing joint and several liability on child sex traffickers), *aff'd*, 783 F. App'x at 277. "If the court finds that more than 1 victim has sustained a loss requiring restitution by the defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." 18 U.S.C. § 3664(i); *see also* 18 U.S.C. § 1593(b)(2).

Here, the government requests that the Court defer its determination on restitution until a date no more than 90 days after the defendant's sentencing because the precise nature of the victims' losses are not presently known to the government. Under 18 U.S.C. § 3664(d)(5), if the victim's losses are not ascertainable before sentencing, the government or the probation officer is

required to inform the Court, and the Court "shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."  The overarching purpose of Section 3664—the procedural arm of the restitution scheme in Section 1593—is "to ensure that victims of crime receive full restitution." *Dolan v. United States*, 560 U.S. 605, 612 (2010). In *Dolan*, the Supreme Court determined that the statute's "effort[] to secure speedy determination of restitution is *primarily* designed to help victims of crime secure prompt restitution rather than provide defendants with certainty as to the amount of their liability." *Id.* at 613. Construing the 90 days so as to limit the victim's ability to recover statutorily mandated restitution would subvert the statute's principal objective. *See id.* ("to read the statute as depriving the sentencing court of the power to order restitution would harm those—the victims of crime—who likely bear no responsibility for the deadline's being missed and whom the statute also seeks to benefit"). Noting that failure to comply with this 90-day directive carries with it no statutory consequences, the Supreme Court held that when, as here, a defendant is aware of the existence of mandatory restitution and the court's intention to address it at a later date, exceeding the 90-day period does not deprive the court of jurisdiction to order mandatory restitution. *See id.* at 615 (where defendant knows that restitution is mandatory prior to expiration of 90-day period, missing statutory hearing date does not invalidate hearing). Consequently, where the Government seeks a continuance within the 90 days for the benefit of the victims of the defendant's crime, granting such request is appropriate and falls squarely within the situation contemplated by the statute.

Deferring restitution in this case would serve the statute's purpose of ensuring the victims receive full restitution for their losses. The government made efforts to come to an agreement with the defendant on this issue, but was advised by counsel that the defendant will not agree to any amount of restitution.

## IV.  <u>**CONCLUSION**</u>

For the reasons set forth above, the government respectfully requests this Court impose a sentence within the defendant's guideline range of 360 months to life imprisonment.   The defendant has earned every day of a substantial prison sentence.

JACQUELINE C. ROMERO
United States Attorney


 */s/ Erica Kivitz*
ERICA KIVITZ
KELLY HARRELL
Assistant United States Attorneys

Dated: June 1, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum to be served by email upon counsel for defendant:

Jonathan McDonald
Jonathan_McDonald@fd.org
*Counsel for Defendant John Adams*

          */s/ Erica Kivitz*
          ERICA KIVITZ
          Assistant United States Attorney

Dated: June 1, 2023